UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 19-mj-03519-Goodman

**IN RE**
**CRIMINAL COMPLAINT**

_____ /

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: _____
Christopher B. Browne
Assistant United States Attorney
Southern District of Florida
Florida Bar No. 91337
99 Northeast 4th Street, 4th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9419
Facsimile: (305) 536-4699
E-mail: christopher.browne@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Akrum Alrahib,<br><br>Defendant(s) | )<br>)<br>) Case No. 19-mj-03519-Goodman<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 22, 2019-August 2, 2019__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(b) | Witness tampering in connection with an official proceeding and law enforcement investigation, in violation of Title 18, United States Code, Section 1512(b)(1), (b)(2), and (b)(3) |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

John Siddons, Special Agent, IRS-CI
Printed name and title

Sworn to before me and signed in my presence.

Date: __Sept. 23, 2019__

_____
Judge's signature

City and state: __Miami, Florida__   __Jonathan Goodman, U.S. Magistrate Judge__
Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, John Siddons, being duly sworn hereby depose and say:

### INTRODUCTION AND AGENT BACKGROUND

1. Your affiant is a Special Agent with the Internal Revenue Service, Criminal Investigation Division (IRS-CI). I have been so employed since September 15, 2011. My duties as a Special Agent include the investigation of criminal violations of the Internal Revenue Code, codified at Title 26 of the United States Code, and criminal violations of Titles 18 and 31 of the United States Code.

2. Your affiant has personally conducted or assisted in dozens of investigations pertaining to criminal violations of the Internal Revenue Code. Many of these investigations focused on individuals who provided false information to the Internal Revenue Service (IRS) by falsifying Federal income tax returns.

3. Your affiant has received training at the Federal Law Enforcement Training Center in Glynco, Georgia, and at the National Criminal Investigator Training Academy (NCITA) in Glynco, Georgia. I graduated from NCITA's Special Agent Investigative Techniques program in March 2012. During the course of that program, your affiant studied law enforcement and criminal investigation techniques involving forensic accounting, search and seizure, tax evasion, and other violations of the Internal Revenue laws.

4. Your affiant was previously assigned to the IRS-CI Washington, D.C. Office, where I served on a long-term detail with the Alcohol and Tobacco Tax and Trade Bureau's (TTB's) excise tax group. TTB's excise tax group investigates criminal violations related to excise taxes on certain commodities including alcohol, tobacco, firearms, and ammunition.

5. During your affiant's time with TTB's excise tax group, I worked with auditors and investigators who conduct tax audits and investigations that are focused on determining whether the proper amount of federal excise tax has been paid on tobacco products and other regulated commodities. However, TTB does not itself currently employ criminal investigators who are empowered to perform the duties outlined in Title 26, United States Code, Section 7608(b), which duties include the execution of search and arrest warrants. Because TTB does not currently employ law enforcement officers to enforce the criminal statutes under its jurisdiction, Congress has provided TTB with funding to obtain the law enforcement personnel needed to conduct criminal investigations. As such, TTB entered into an inter-agency agreement with IRS-CI. Under the inter-agency agreement, IRS-CI agents are detailed to TTB to investigate possible criminal violations under TTB's jurisdiction.

6. The information contained in this affidavit is based on my own investigation and information received from TTB auditors and investigators, as well as other witnesses and law enforcement officers. This affidavit is submitted for the limited purpose of establishing probable cause for the arrest of Akrum ALRAHIB for violations of Title 18, United States Code, Section 1512(b)(1), (b)(2), and (b)(3), that is, witness tampering in connection with an official proceeding and law enforcement investigation. Accordingly, this affidavit does not include every fact known by me and others with respect to this investigation.

## PROBABLE CAUSE

### Ongoing Excise Tax Evasion Investigation

7. On July 21, 2019, a Grand Jury sitting in the Southern District of Florida issued two subpoenas: one to IST Brands, Inc., a Florida tobacco distributor, and a second to IST Brands, Inc.'s officer and registered agent, J.G. The subpoenas called for testimony as well as

records and other information related to, among other individuals and entities, Akrum ALRAHIB—a defendant in a Federal excise tax evasion case currently pending before the Honorable District Judge Rodney Smith. See United States v. Alrahib, Case No. 19-20165-CR-Smith (S.D. Fla.), Indictment [ECF No. 1]. The indictment in the pending criminal case was filed on March 28, 2019, and charged ALRAHIB with offenses occurring between April 2013 and December 2014. Id. at 4.

8. Law enforcement is currently investigating ALRAHIB's ongoing participation in an excise tax evasion scheme on imported tobacco products—the same type of conduct that formed the basis for the conspiracy, wire fraud conspiracy, wire fraud, and excise tax evasion charges alleged in the indictment in the above-numbered criminal case. Id. However, I note that the excise tax evasion scheme that is the subject of the ongoing Grand Jury investigation post-dates the charges in the pending indictment by several years.

9. Since May 2019, customs officials have seized three (3) shipping containers loaded with cigars and other tobacco products manufactured by ALRAHIB's Dominican Republic-based tobacco manufacturing company, FASST Holdings SRL ("FASST Holdings"). According to business records maintained in the Dominican Republic, Defendant has owned that company since in or around 2014.

10. The tobacco shipments intercepted by Customs officials, along with several more uninspected containers, were shipped to another one of ALRAHIB's companies, IST Brands, Inc. ("IST Brands"). From December 2018 through July 8, 2019, ALRAHIB was the President, Vice President, and Registered Agent of IST Brands. On July 9, 2019, in an amended annual report filed with the State of Florida's Department of State, IST Brands removed ALRAHIB as

officer and Registered Agent and replaced him with J.G.—ALRAHIB's longtime friend and employee.

11.  Once Customs officials learned of ALRAHIB's ongoing importation of tobacco products, they recalled several of the shipments for inspection. Based on Customs records and other information obtained during TTB's ongoing investigation, it appears that IST Brands has continued to distribute ALRAHIB's tobacco products following ALRAHIB's release on bond in the indicted criminal case. According to Customs records, IST Brands received approximately nine (9) shipments of tobacco products from FASST Holdings since ALRAHIB's release on bond.

12.  Notably, during that time period, ALRAHIB was prohibited from employment in the tobacco industry, as a condition of his release on home detention. See United States v. Alrahib, Case No. 19-20165-CR-Smith (S.D. Fla.), May 17, 2019 Order Setting Conditions of Pretrial Release [ECF No. 40] at 2. I further note that, as a condition of his home detention, ALRAHIB resides at the residence of C.K., a friend of ALRAHIB. Id., July 20, 2019 Motion to Modify Conditions of Bond [ECF NO. 58] at 1 ("[ALRAHIB] has remained confined to the Coral Gables residence of his family friend [C.K.], . . . , [C.K.]'s sister [REDACTED], and their mother . . . .").

13.  The above-described cigar shipments, and the importation documents associated with them, appear to show a consistent pattern of excise tax evasion. The evidence indicates ALRAHIB is engaged in a "self-dealing" scheme through a straw importer—the same scheme ALRAHIB previously admitted he used to fraudulently lower the excise tax due and owing on imported cigars between 2016 and 2017.

14. In sum, by manufacturing the cigars at his Dominican company, and purchasing the tobacco from himself at a price that does not reflect the actual cost of the cigars, ALRAHIB has fraudulently lowered the "first sale price" on which the cigars are taxed. ALARAHIB has previously participated in this type of scheme: as he explained to agents in May 2017, ALRAHIB previously recruited pass-through importers to assist him in lowering his tax liabilities in this manner.

15. With respect to the ongoing activity, I note that, upon seizing Defendant's most recent tobacco shipment, Customs officials inspected the cargo and found cigars packaged in foil packs, each of which contained two (2) cigars pre-labeled for retail sale at "2/$1.29". On the back of these packs was the following text: "Distributed By: IST BRANDS, INC. MIAMI FL 33166". According to documents accompanying the shipment, ALRAHIB's Dominican company charged the importer $.038 per cigar. The importer then sold those cigars back to ALRAHIB's Florida company (IST Brands) for $.0393, each—a fraction of the retail price. This nominal markup shows that the importer was simply a pass-through, charging only enough to cover the importer's costs, the excise tax due, and a very small fee. See 26 U.S.C. § 5703(a)(1) (imposing liability on the importer of tobacco products for the payment of excise taxes pursuant to 26 U.S.C. § 5701).

16. In addition, bank records obtained during the course of my investigation show large payments from ALRAHIB's Florida company, IST Brands, between February and April 2019, to ALRAHIB's Dominican company, FASST Holdings. This suggests that ALRAHIB is not reporting the actual first sales price used to calculate the amount of tax due to the government, but is instead fraudulently lowering the tax due on each shipment by concealing the funds his companies sent to FASST Holdings to cover the true cost of the cigars. This is just a

5

variation of the scheme charged in the indictment, which Defendant previously admitted in a recorded interview with IRS-CI and TTB agents.

### Grand Jury Subpoenas to J.G.; Witness Tampering

17.     As noted, the Grand Jury issued two subpoenas to J.G., the listed officer and registered agent of IST Brands. J.G. accepted service of the subpoenas on July 22, 2019, and retained counsel through ALRAHIB's company.

18.     On August 15, 2019, J.G. was interviewed by an IRS-CI agent and Assistant United States Attorneys. Also present for the interview, via telephone, was an investigator from the TTB. I note that J.G. was interviewed in the presence of counsel and pursuant to a limited-use immunity letter.

19.     During the interview, J.G. stated that on or about August 2, 2019, approximately one week before the return date listed on the grand jury subpoenas, C.K. invited J.G. to lunch at a seafood restaurant near Medley, Florida. As noted, ALRAHIB is presently on home detention at C.K.'s residence.

20.     J.G. explained that the purpose of the meeting with C.K. was for C.K. to propose a way for J.G. to avoid testifying before the Grand Jury. According to J.G., during the lunch meeting, C.K. stated that he was just the messenger. C.K. presented J.G. with two options. The first option presented by C.K. was an offer to arrange for J.G. to travel to Mexico for three to six years and earn $200,000 per year operating ALRAHIB's businesses there. Under this option, J.G. could not come back to the United States and would have to avoid law enforcement. J.G. could have no contact with family members in the United States. Under option two, J.G. was to "ride it out" with ALRAHIB and the lawyers.

21. According to J.G., in the first scenario, C.K. told J.G. that it would be better to leave to Mexico before the date of the grand jury.

22. Subsequent to his interview with law enforcement, J.G., through counsel, identified the cellular telephone used by C.K. to communicate with J.G. Location data associated with C.K.'s cellular telephone confirmed C.K. was in the vicinity of the seafood restaurant where the above-described meeting took place during the afternoon of August 2, 2019. In addition, records maintained by the restaurant confirmed C.K. paid for C.K. and J.G.'s lunch on August 2, 2019, using C.K.'s credit card.

### ALRAHIB's Ongoing Tobacco-Related Activities

23. J.G. further explained that ALRAHIB continues to operate his various tobacco businesses while on home detention at C.K.'s residence. In order to conceal his involvement, which is prohibited by the Court-imposed bond conditions, ALRAHIB communicates with employees, distributors, and others involved in ALRAHIB's tobacco companies, including J.G., through C.K.'s twenty-two-year-old sister. As noted, C.K.'s sister also resides at the residence where ALRAHIB is confined.

24. As an example, J.G. explained that he would often "FaceTime" with C.K.'s sister, who functions as an administrative assistant at IST Brands, to discuss the distribution and sale of tobacco products. J.G. noted that ALRAHIB prefers "FaceTime" video chats because ALRAHIB believes these communications cannot be monitored by law enforcement. During these video chats, ALRAHIB physically appeared behind C.K.'s sister, and would direct C.K.'s sister how to answer J.G.'s questions. J.G. estimated that this had happened approximately ten times and that he had last interacted with ALRAHIB, through C.K.'s sister, a few days prior to the interview with law enforcement.

### C.K. Interview with Law Enforcement

25. On September 13, 2019, I traveled to C.K.'s workplace and served C.K. with a Grand Jury subpoena for testimony and records concerning C.K.'s communications with J.G. C.K. retained counsel in connection with the Grand Jury subpoena.

26. On September 20, 2019, I interviewed C.K. along with Assistant United States Attorneys. I note that C.K. was interviewed in the presence of counsel and pursuant to a limited-use immunity letter.

27. During the interview, C.K. confirmed that he was approached by ALRAHIB, at C.K.'s residence, a few days prior to the August 2nd lunch meeting with J.G. ALRAHIB and C.K. discussed the plan to offer J.G. an opportunity to avoid testifying before the Grand Jury.

28. During this conversation, ALRAHIB explained that C.K. should offer J.G. an opportunity to relocate to Mexico and operate ALRAHIB's businesses there for a period of five to eight years. ALRAHIB told C.K. to tell J.G. that J.G. could not return to the United States or contact J.G.'s family members during that time. ALRAHIB also directed C.K. to offer J.G. a second option: to "ride it out" with ALRAHIB and refuse to "snitch."

29. When explaining the proposal to C.K., ALRAHIB wrote out the terms of the proposal on a piece of paper, including the proposal to relocate J.G. to Mexico for several years in exchange for a $200,000 per-year salary. C.K. noted that, immediately following ALRAHIB's discussion with C.K., ALRAHIB tore the paper into pieces and discarded it.

30. C.K. confirmed that he invited J.G. to lunch at the above-described seafood restaurant on August 2, 2019. There, C.K. told J.G. that C.K. was only functioning as a "messenger." During the interview with law enforcement, C.K. admitted that, at ALRAHIB's direction, he presented J.G. with two options to avoid testifying before the grand Jury: (a)

8

relocate to Mexico for several years in exchange for a salary of $200,000 per year, or (b) "ride it out" with ALRAHIB.

31. C.K. acknowledged that the purpose of the meeting with J.G. was to persuade J.G. to avoid testifying before the Grand Jury. C.K. acknowledged that it was wrong to attempt to persuade J.G. not to testify.

32. During the interview, C.K. stated that he had been avoiding ALRAHIB since being served with the Grand Jury subpoena. C.K. further explained that following ALRAHIB's release on home detention at C.K.'s residence, ALRAHIB had loaned C.K. approximately $70-75,000 dollars, which sum C.K. had not repaid. In addition, C.K. acknowledged that prior to his arrest, ALRAHIB had previously loaned him a sum of approximately $20,000, which C.K. had not repaid. C.K. explained that, in exchange for residing at C.K.'s residence, ALRAHIB also frequently paid bills, and provided gifts to C.K.'s family members. C.K. also acknowledged that ALRAHIB paid C.K.'s sister in exchange for her work on ALRAHIB's behalf.

33. When asked whether ALRAHIB was aware that ALRAHIB's supervising Probation Officer had recently written a memorandum to the Court outlining ALRAHIB's violations of the conditions of house arrest, C.K. responded that ALRAHIB was aware that the Probation Office had discovered some minor bond violation.

34. Following the interview with law enforcement, C.K. provided, through counsel, several "screenshots" of C.K.'s communications with J.G., including a text message on August 2, 2019, in which C.K. asked to "meet up" with J.G. C.K. also provided a log of ALRAHIB's "FaceTime" calls with C.K. C.K. explained that ALRAHIB preferred communicating via "FaceTime" because ALRAHIB believed "FaceTime" chats could not be tracked by law enforcement.

9

## **CONCLUSION**

35. Based on my training and experience, and the information provided in this affidavit, there is probable cause to believe that on or about the dates set forth above, within the Southern District of Florida, Akrum ALRAHIB did commit the following offenses: witness tampering in connection with an official proceeding and law enforcement investigation, in violation of Title 18, United States Code, Section 1512(b)(1), (b)(2), and (b)(3).

FURTHER AFFIANT SAYETH NOT.

_____
John Siddons
Special Agent, IRS-CI

Subscribed and sworn to before me
this ___ day of September, 2019

_____
HONORABLE JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE